**R. H. DEARING & SONS v. TEXAS CONST. CO. et al.　(No. 852–4931.)***

Commission of Appeals of Texas, Section B. Jan. 4, 1928.

**1. Contracts ⬅176(1)—Meaning of unambiguous contract is for court.**

The meaning of a contract, not ambiguous in its terms, is for the court.

**2. Contracts ⬅198(6)—Well-drilling contract held to require test by subcontractor whenever requested by contractor before completion of work, not merely while drilling through certain sands.**

Subcontract to drill water well, whereby subcontractor agreed to test well, "as the same is being drilled," after certain sands were encountered, "whenever and as requested by" principal contractor, *held* to require subcontractor to make test whenever requested before completion of work, not merely while drilling through such sands, in view of undisputed evidence that purpose was to determine quantity of flow, pressure, and consequent static head of water as guide to location of pumping equipment, as well as to exercise of right to stop drilling after encountering such sands at any depth short of that originally contemplated.

**3. Contracts ⬅280(5)—Loss from destruction of water well during required test by subcontractor should fall on subcontractor.**

Loss from destruction of water well by collapse of casing in making of test by subcontractor at request of principal contractor, as required by contract, should fall on subcontractor; there being a breach of latter's duty to complete work undertaken.

**4. Damages ⬅78(4)—Owner and well-drilling contractor held entitled to recover liquidated damages from subcontractor for number of work days from date of starting well until completion of second well after destruction of first.**

Under paragraph of subcontract, requiring completion of water well within 200 work days from date of starting and binding subcontractor to pay stated sum for every day's delay in completion thereof beyond date specified as liquidated damages, owner and principal contractor should recover for delay on basis of number of work days from date of starting well to time of its ultimate completion by drilling of second well after destruction of first in making test required by contract.

Error to Court of Civil Appeals of Eighth Supreme Judicial District.

Action by R. H. Dearing & Sons against the Texas Construction Company and another, in which defendants filed a cross-action. A judgment for plaintiff in both actions was reversed, and the cause remanded by the Court of Civil Appeals (296 S. W. 1112), and plaintiff brings error. Modified in part, and affirmed in part.

Smithdeal, Shook, Spence & Bowyer, of Dallas, for plaintiff in error.

Beall, Worsham, Rollins, Burford & Ryburn, of Dallas, for defendants in error.

SPEER, J. Texas Construction Company held a contract with Dallas Power & Light Company for the drilling and completion of a deep water well by the Construction Company for the Power & Light Company, and the Construction Company entered into a contract with R. H. Dearing & Sons, a copartnership, by which they undertook the drilling and completion of the well, as evidenced by the following contract:

"Whereas, the Texas Construction Company, a corporation duly incorporated under the laws of the state of Texas, has heretofore made and entered into a contract with the Dallas Power & Light Company, a corporation duly incorporated under the laws of the state of Texas, and hereinafter called 'owner,' by the terms of which, among other things, the said Texas Construction Company has agreed, obligated, and bound itself to drill, case, and complete for the owner a deep water well, according to the specifications and to be located as hereinafter set out; and, whereas, the said Texas Construction Company desires to sublet the said contract for the drilling, casing, and completing of said well:

"Therefore, know all men by these presents that this contract this day made and entered into by and between the said Texas Construction Company, hereinafter called the 'company,' and R. H. Dearing, W. R. Dearing, and Roy E. Dearing, a copartnership doing business under the firm of R. H. Dearing & Sons of Dallas county, Tex., hereinafter called the 'contractor,' witnesseth:

"(1) The contractor has this day agreed and contracted with the company to drill and case said deep water well; the said well to be located on a certain lot of ground situated in the city of Dallas, owned by the Dallas Power & Light Company, and located as follows: On what is known as the Dallas Power & Light Company's plant, in the city of Dallas, and on the opposite side of the Katy Railway yards from the foot of Griffin street, the exact location on said lot to be made by the owner.

"(2) Said well is to be drilled and cased from 24 inches above the normal ground surface of the earth adjacent to the well down to and through all of the Paluxy sands; but in no event to be drilled to a greater depth than 1,800 feet. From the surface of the earth down to a depth of 500 feet said well shall be cased with 22-inch inside diameter 75-pound per lineal foot steel casing, which shall be welded where joined. Said casing shall be set in such manner as to case out all shaly, sand, or mud formations, and also all water above.

"(3) From said point, that is, from the point 500 feet below the surface of the earth and at the bottom of the 22-inch casing, said well shall be cased to the upper Paluxy sands with an 8¼-inch 32-pound per lineal foot Byers wrought-iron liner or packer casing, which casing shall be equipped with long oil country couplings, and shall be provided with ten threads to the inch. The lower or 8¼-inch casing shall be so set as to center accurately with the 22-inch casing above it, and shall be set in such manner as to

case out all shaly, mud, or sand formation and all waters above.

"(4) From the lower extremity of the said 8¼-inch casing, said well is to be drilled from said point, until it is completed, with as large a bit as practicable to pass through the 8¼-inch 32-pound per lineal foot casing. Said well shall, at the option of the company, be cased with a strainer casing from the lower extremity of the 8¼-inch casing to the bottom thereof with 6-inch inside diameter Byers wrought-iron 19.66-pound per lineal foot casing. Said 6-inch casing to be drilled with ⅝-inch holes over its entire area, so that the maximum distance between the center of any adjacent holes will be 3-inch centers.

"(5) The first 500 feet shall be drilled and casing set before the well is drilled below that depth. It shall then be drilled to the depth that it is to be cased with the 8¼-inch casing, as aforesaid, and said casing set before it is drilled below that depth; and after the 8¼-inch casing is set, said drilling shall than be completed.

"(6) The contractor agrees that all casing shall be set in such manner and all drilling operations conducted in such a way that if it is deemed necessary or advisable said well can be 'shot' to increase the flow, without injury or damage to either the casing set or the drilling then completed.

"(7) The contractor agrees to furnish all labor, derrick, power, casing, materials, equipment, tools, freight, and delivery expense, and all other things, whether labor or material, without limitation, necessary to drill and equip said well and to finish the same as hereinabove set out, and to deliver the same to the company free of all material, labor, or other liens in a first class workman-like condition, and in accordance with the conditions herein set out at $22.50 per lineal foot for first 500 feet, and $11.50 per lineal foot for the remaining depth, but not to exceed a total depth of 1,800 feet.

"Said amount shall be paid as follows:

"(a) Upon delivery at owner's property hereinabove described of well casing for use on the work herein set forth, company will pay to contractor an amount equal to the cost to contractor of said casing, plus freight charges; said amount to be evidenced by paid invoices and freight bills which shall be presented and surrendered to company;

"(b) Thirty days after the actual commencement of drilling by contractor, and at the end of each succeeding 30 days thereafter, company will pay to contractor for work completed in the preceding 30-day period an amount equivalent to $8.45 per foot for each foot of 22-inch well completed as aforesaid, and $4.50 per foot for each foot of 8¼-inch well completed as aforesaid;

"(c) Upon completion of said well, in accordance with all the provisions of this agreement, and upon acceptance of the work by company and by owner, company will pay to contractor the balance of the contract price provided for in this agreement.

"Company may, at its option, in lieu of all or any part of any cash payment required by the provisions of subdivisions (a), (b), and (c), deliver to contractor an equivalent amount of owner's 7 per cent. cumulative preferred stock at par value; provided, however, that in no event shall the total amount of such stock so de-

livered exceed 33⅓ per cent. of the total contract price hereinabove specified.

"(8) The contractor agrees that he will inform himself of and comply with all laws, regulations, rules, and requirements of the state of Texas regarding the drilling of water wells, and of such laws, regulations, rules, and requirements of any other governmental authority having jurisdiction in the premises, and will assume all liability for damages or penalties arising out of the violation of or failure to observe such laws, regulations, rules, and requirements.

"(9) It is further agreed by the contractor that he will carry liability insurance for the protection of the contractor, the Texas Construction Company, and the owner, as their interest may appear, against any and all claims of damages of whatsoever nature arising out of injuries to his or their employees, or any of them, or to the general public, resulting either directly or indirectly from his operations.

"(10) The contractor agrees with the company that, in the event it becomes necessary to shoot the well, the company shall pay only the actual cost thereof, but that said cost will not exceed, under any circumstances, the sum of $1,750 (which shall be in addition to the contract price aforesaid), which said amount shall include any changes or rearrangements made necessary by the result of the shooting of said well.

"(11) The contractor agrees to test said well, as the same is being drilled, after the Paluxy sands have been encountered, whenever and as requested by the company, and in making said test the company shall furnish, at its expense, all apparatus for making said test, and the contractor shall, at his expense, make said test and furnish all labor necessary in making same. The company may have the drilling of said well stopped, at its option, at any time after the Paluxy sands have been encountered, and payment shall be made in such case for the actual number of feet drilled.

"(12) Work shall commence on said well within 5 days from the date of signing this contract, and said well shall be completed and fully equipped within 200 work days from the date of starting. The contractor hereby acknowledges that the time for the completion of the work is of the essence of this contract, and that, in the event of his failure to complete the work within the time specified, the owner will be greatly damaged, and its damages will be difficult of ascertainment. It is therefore agreed, and the contractor binds himself, that he will pay the owner the sum of $38.50 per day for every day's delay in the completion of the work beyond the date specified, which sum it is hereby agreed shall be construed as liquidated damages and not as a penalty.

"(13) The contractor agrees and binds himself to furnish with his contract a bond in the sum of $28,000, guaranteeing the full and satisfactory performance of this contract, and further guaranteeing the payment of all labor and work done and material and fixtures furnished and used in the carrying out and in the performance of this contract.

"(14) The contractor further agrees that where there is a conflict, if there is a conflict, between his former proposals of February 2, 1923, and February 10, 1923, and this contract; the stipulations of this contract shall be the

agreement between the parties and shall be controlling, and that this contract supersedes all previous agreements or representations, either written or verbal, between the parties hereto.

"(15) If, at any time before the said well is completed, the said company shall desire that another well shall be drilled on the same lot as the well herein contracted for is drilled, the contractor agrees to drill said second well in accordance with each and every of the conditions, provisions, and terms of this contract, save and except that it agrees that the contract price of the second well shall be $2,000 less than the total contract price of the well herein contracted for for the same depth. If the second well is drilled to a greater depth than the first well, the excess shall be paid for at $11.50 per lineal foot for such excess. In the event the company exercises its option of having said second well drilled, it shall give the contractor written notice of its exercise of said option at least 5 full days before the completion of the well herein contracted for.

"(16) It is understood and agreed by both parties that this contract is executed with the full and complete knowledge of its contents and of all its conditions and provisions, and with the further knowledge of the kind, quantity, and quality of the articles, materials, and work required, and of the guaranties and representations herein stated, made, and set out.

"(17) It is further specifically agreed that this contract is executed subject to all the laws and governmental regulations of the city of Dallas, and to the provisions of the franchise from the city of Dallas to Dallas Power & Light Company, and that this contract is not binding upon the company unless and until signed by one of its executive officers.

"In witness whereof, witness our hands in duplicate, originals on this the 14th day of February, A. D. 1923. Approved as to quality and form.

"Texas Construction Company,
"By R. J. Hughes, President.
"R. H. Dearing & Sons,
"By Roy E. Dearing.
"Attest:    C. E. McBride, Asst. Secretary."

Dearing & Sons drilled the well to the required depth, but in making a test the well was destroyed and lost to all parties, and another well was drilled and completed, for which Dearing & Sons were paid in full. This suit was instituted by Dearing & Sons against the Texas Construction Company and the Dallas Power & Light Company to recover $24,422, with interest, for the drilling of the first well. The defendants answered, pleading the terms of the contract, and that the well had not been completed and finished as provided, but that before it had been delivered to or accepted by them, the casing had collapsed from no fault of theirs; that the well had not been fully completed as provided for in the contract before the collapse occurred; that the test through which the collapse occurred was being made by the plaintiffs under the terms of the contract; and other allegations not necessary to notice. The defendants also by way of cross-action sought

to recover $5,967.50 for a delay of 155 days at $38.50 as the stipulated liquidated damages under the contract.

The case was tried to a jury, and certain special issues were submitted, upon the answers to which the court rendered judgment for the plaintiffs for $27,861.93, and likewise in their favor upon the defendants' cross-action. Upon appeal, the Court of Civil Appeals for the Eighth District reversed the judgment and remanded the cause upon holding that the trial court should have given the defendants' requested summary instruction.

[1, 2] The disposition of the case here depends upon the construction of paragraph 11 of the contract, providing for the test through which the first well was lost.

Plaintiffs in error contend that the test that was being made at the time the casing collapsed was not part of their duty, because of the fact that the drilling of the well had proceeded through the Paluxy sands, and was therefore completed; while defendants in error contend that the expression "being drilled" was broader and imposed upon plaintiffs in error the duty of making the test whenever the corporation or owner should make a request therefor at any time before the completion of the work undertaken.

We agree with the Court of Civil Appeals in its construction of this contract. It is not ambiguous in its terms, and its meaning was for the court. The purposes of the test may, in some measure, rest in parol, but the contract very specifically provides for the test, and the plaintiffs in error very clearly are given the right to such test "whenever and as requested." Of course, this request must have been made before the completion of the contract, for the test, if requested, was to be a part of the performance. There is nothing in the contract limiting the right of the one party and the duty of the other to a test during that time only when the drill was piercing the Paluxy sand. The contention of plaintiffs in error that such was the effect is predicated upon the supposed purposes of the test; the argument being that the object of the test "after the Paluxy sands have been encountered" was to determine the nature and extent of the flow and to guide the owner in its right to stop the well at any depth short of the original contemplated depth. If it were correct that the provision for a test was intended for no other purpose than the one mentioned, or that it could not serve any useful purpose to defendants in error after the Paluxy sands had been passed and the drilling stopped, there would be much force in plaintiffs in error's contention. But, having stipulated so clearly for the test "whenever and as requested," the defendants in error were entitled, under the terms of the contract, at any time before the final completion of the work undertaken, if such test could in any manner be beneficial to them, to have the test made. As

above indicated, whether or not the test at the time it was actually made was calculated to be of benefit to the defendants in error rests in parol. Under the undisputed evidence, one useful purpose of the test was to determine the quantity of the flow, the extent of its pressure, and the consequent static head of the water in the well as a guide to the location of pumping equipment. While it is true the furnishing and setting of this equipment appears to have been the duty of the owner, nevertheless the test was necessary, or at least helpful, in determining its setting. There is no controversy in the testimony as to this point, and for that reason, if no other, it cannot be said the making of the test at the time it was made was not part of plaintiffs in error's duties under the contract.

While the interpretation of the contract is one of law for the court, nevertheless it is significant that plaintiffs in error so interpreted the contract, and their own testimony shows that the test was made without protest, and, indeed, the suggestion therefor originated with the plaintiffs in error, one of them testifying:

"I reported that we were through the Paluxy sand, and if they cared to make a test we were through drilling now, and now would be the time to make the test if they cared to have one made. * * * I understood that I had to make this test if they required it."

The evidence also shows that plaintiffs in error furnished the labor and some of the equipment for making the test, never at any time denying that they were under the duty of making the test by the terms of the contract until long after the collapse of the well.

[3] We quite agree with the Court of Civil Appeals that the company had the right under the contract to request the test to be made, which was made, and that, the well having been destroyed during the making of the test, the loss should fall on the contractor. There was a breach of the contractor's duty to complete the work they had undertaken. Weis v. Devlin, 67 Tex. 507, 3 S. W. 726, 60 Am. Rep. 38; Lonergan v. San Antonio Trust Co., 101 Tex. 63, 104 S. W. 1061, 106 S. W. 876, 130 Am. St. Rep. 803; Ingle v. Jones, 2 Wall. 1, 17 L. Ed. 762; Chapman v. Warden, 50 Tex. Civ. App. 282, 110 S. W. 533; Felton v. Talley, 31 Tex. Civ. App. 336, 72 S. W. 614; Binz v. National Supply Co. (Tex. Civ. App.) 105 S. W. 543.

[4] For these reasons, the trial court should have instructed a verdict for the defendants as to plaintiffs' demand. As to the defendants' cross-action, the case does not appear to have been fully developed, and this should be heard and determined under paragraph 12 of the contract upon the basis of the number of "work days from the date of starting" the

well to the time of its ultimate completion by the drilling of a second one.

We therefore recommend that the judgment of the Court of Civil Appeals be modified as to the instructions for a summary direction of verdict for the defendants, but as to the reversal and remanding of the cause its judgment be affirmed.

CURETON, C. J. The judgment of the Court of Civil Appeals is modified and affirmed as recommended by the Commission of Appeals.