McDANIEL et al. v. CITY OF BEAUMONT.

No. 2885.

Court of Civil Appeals of Texas. Beaumont.
March 6, 1936.

Rehearing Denied April 1, 1936.

Bell & McDougald, of Beaumont, for appellants.

Morris & Bennett, of Beaumont, for appellee.

WALKER, Chief Justice.

C. H. and Howard McDaniel, appellants, were plaintiffs below, and appellee, city of Beaumont, was defendant. By their petition, appellants undertook to plead a cause of action for "extra costs" incurred by them in the erection of a high school building for defendant under the following contract:

"This agreement, made this 27th day of November, A. D. Nineteen Hundred and Twenty-Eight between McDaniel Brothers Contractors, a partnership composed of C. H. & Howard McDaniel, of Beaumont, Jefferson County, Texas, party of the first part, and the City of Beaumont, Municipal corporation of, Jefferson County, Texas, Owner, party of the second part.

"Witnesseth: That the said party of the first part, for and in consideration of the payments to be made to him by the said second party as hereinafter provided does hereby covenant, contract, and agree to erect a City High School Building on site adjoining the Oaks Addition of the City of Beaumont, Texas, according to plans, specifications and drawings (which are declared to be a part of this agreement) made by F. W. & D. E. Steinman, Architects for said Owner, Beaumont, Texas, and Harry D. Payne, Houston, Texas, consulting Architect, in a good substantial workmanlike manner, to the satisfaction and under the direction of the superintendents.

"And said first party also does agree to find, provide, and furnish all labor and materials of such kinds, qualities, and descriptions as shall be fit, proper, and sufficient for completing and finishing all the .work or works mentioned (provided that possession of the premises be given to the contracts on or before November 25, 1928, same to be completed on or before December 1, 1929. Time to be extended only in case of general strike, alterations, fire or unusual action of the elements.

"And the second party for and in consideration of the first party completely and faithfully executing the aforesaid work, and furnishing all the materials therefor, so as fully to carry out this contract and the Design, according to its true spirit, meaning, and intent, and by at the times mentioned, and to the full and complete satisfaction of F. W. & D. E. Steinman, Superintendents, does hereby agree to pay to said party the sum of Six Hundred Nine Thousand Eight Hundred Twenty Seven Dollars ($609,827.00) from time to time as the work progresses, to-wit Ninety per cent of the estimated value of the same, subject to additions and deductions, as hereinafter provided.

"Estimates to be issued on or about the first of each month, provided the payment of former estimates have been properly applied to labor and material used and embodied in the building, and the remainder on satisfactory completion and acceptance of the entire work, after the expiration of thirty days.

"It is agreed by the parties that ten per cent of the contract price shall be held by the Owner as security for the faithful completion of work, and may be applied, under the direction of the Superintendent, in the liquidation of any damages under this contract; furnishing to the Owner a release from any liens or right of lien.

"It is further agreed that all work exhibited or provided to be done in the plans, or drawings, and not mentioned in the specifications, or vice versa, shall be executed and performed in like manner, as if the same were fully mentioned and described in each thereof, respectively, without extra charges.

"It is also further agreed that the said party of the second part may make all alterations by adding, omitting or deviating from the aforesaid plans, drawings and specifications, or either of them, which they shall deem proper, and the said Architects shall advise without impairing the validity of this contract, subject, however, to the other terms hereof and the plans and specifications which are made a part hereof, and in all cases the said Architects shall value or appraise such alteration and add to or deduct from the amount herein agreed to be paid to the said first parties the excess of deficiency occasioned by such alterations, but should any dispute arise respecting the true value of any extra works added or omitted by the Contractor, the same shall be arbitrated by appealing to three disinterested parties, one selected by the parties of the first part, one selected by the party of the second part, and the two shall select a third, whose decision shall be final and binding on all parties. Each party paying one half of the fee. It is further agreed that in case any difference of opinion shall arise between said parties in relation to the contract, the work to be, or that has been performed under it, or in relation to the plans, drawings and specifications hereto annexed the decision of F. W. & D. E. Steinman, the Architects shall be final and binding on all parties hereto.

"It is further mutually agreed between the parties hereto that no certificate given or payment made under this contract, except the final certificate or final payment, shall be conclusive evidence of the performance of this contract, either wholly or in part, against any claim of the Owner, and no payment shall be construed to be an acceptance of any defective work.

"It is further agreed should the contractor fail to finish the work at the time agreed upon, he shall pay to or allow the Owner, by way of liquidated damages, the sum equal to the actual damages which is One Hundred Dollars ($100.00), for each and every day thereafter the said works shall remain incomplete, subject to the right of arbitration above mentioned.

"It is further agreed that the parties of the second part shall not in any manner be answerable or accountable for any violation of the City Ordinances, or any loss or damage arising from negligence or carelessness of the first part to any persons or person and their property; also that all the foregoing conditions and stipulations shall be mutually binding upon executors, administrators, and assigns.

"In witness whereof: The said parties have hereunto set their hands and seal the 27th day and year first above written.

"McDaniel Brothers
"By [Signed]   C. H. McDaniel
"[Signed]   E. W. Gross
[Seal]

"In presence of:
"[Signed]   Raymond Edmond
"11/20/28
"Approved as to form
"[Signed]   J. B. Morris, City Attorney."

The amended specifications, identified and adopted, contain, among others, the following typewritten provisions:

"Specifications of material to be furnished and labor to be performed in the erection and completion of a three story fire proof High School Building for the City of Beaumont, Texas, on a site as furnished for same in accordance with plans, specifications and drawings already prepared and to be prepared by F. W. Steinman and D. E. Steinman, architects, Beaumont, Texas, Harry D. Payne, Consulting Architect, Houston, Texas ———
"Definition of Terms:

"The terms used in these specifications are defined as follows:

" 'The City of Beaumont' or 'Owner' shall mean the Board of Education acting for the City of Beaumont.

" 'Architects' shall mean F. W. Steinman and D. E. Steinman, A. I. A., who have been retained by the Board of Education as Architects, and Harry D. Payne,

A. I. A. of Houston, Texas, consulting Architect.

" 'Contractor' shall mean the person or persons who have contracted for the completion of the work with the Board.' "

That in addition to such typewritten provisions, said specifications, so identified and adopted, contained the customary printed form of "general conditions" recommended by the American Institute of Architects for all building contracts, and which "general conditions" contained, among other provisions, the following:

"Art. 1.  Definitions.

"(a) The Contract Documents consist of the Agreement, the General Conditions of the contract, the drawings and specifications, including all modifications thereof incorporated in the documents before their execution.  These form the contract.

"(b) The Owner, the Contractor and the Architect are those mentioned as such in the Agreement.  They are treated throughout the contract Documents as if each were of the singular number and masculine gender. * * *

"(e) The term 'Work' of the Contractor * * * includes labor or materials or both.

"Art. 2.  Execution, Correlation and Intent of Documents. * * * The Contract Documents are complementary, and what is called for by any one shall be as binding as if called for by all.  The intention of the documents is to include all labor and materials, equipment and transportation necessary for the proper execution of the work.

"Art. 3.  Detail Drawings and instruction,—The Architect shall furnish with reasonable promptness, additional instructions, by means of drawings or otherwise, necessary for the proper execution of the work.  All such drawings and instructions shall be consistent with the Contract Documents, true developments thereof, and reasonably inferable therefrom.

"The work shall be executed in conformity therewith and the contractor shall do no work without proper drawings and instructions.

"Art. 12.  Protection of Work and Property.—The Contractor shall continuously maintain adequate protection of all his work from damage and shall protect the Owner's property from injury or loss arising in connection with this contract.  He

shall make good any such damage, injury or loss, except such as may be directly due to errors in the Contract Documents or caused by agents or employees of the Owner. * * *

"Art. 14.  Superintendence:  Supervision.—The Contractor shall give efficient supervision to the work, using his best skill and attention.  He shall carefully study and compare all drawings, specifications and other instructions and shall at once report to the Architect any error, inconsistency or omission which he may discover, but he shall not be held responsible for their existence or discovery.

"Art. 16.  Claims for Extra Cost.—If the Contractor claims that any instructions by drawings or otherwise involve extra cost under this contract, he shall give the Architect written notice thereof within a reasonable time after the receipt of such instructions, and in any event before proceeding to execute the work, except in emergency endangering life or property, and the procedure shall then be as provided for changes in the work.  No such claim shall be valid unless so made.

"Art. 25.  Certificates of Payments.— The making and acceptance of the final payment shall constitute a waiver of all claims by the Owner, other than those arising from unsettled liens, from faulty work appearing after final payment or from requirement of the specifications, and of all claims by the Contractor, except those previously made and still unsettled.

"Art. 31.  Damages.—If either party to this contract should suffer damage in any manner because of any wrongful act or neglect of the other party or of anyone employed by him, then he shall be reimbursed by the other party for such damage.

"Claims under this clause shall be made in writing to the party liable within a reasonable time at the first observance of such damage and not later than the time of final payment, except as expressly stipulated otherwise in the case of faulty work or materials, and shall be adjusted by agreement or arbitration.

"Art. 38.  Architect's Status.—The Architect shall have general supervision and direction of the work.  He is the agent of the Owner only to the extent provided in the contract Documents and when in special instances he is authorized by the Owner so to act, and in such instances he shall, upon request, show the Contractor written au-

thority. He has authority to stop the work whenever such stoppage may be necessary to insure the proper execution of the contract.

"As the Architect is, in the first instance, the interpreter of the conditions of the contract and the judge of its performance, he shall side neither with the Owner nor with the Contractor, but shall use his powers under the contract to enforce its faithful performance by both.

"In case of the termination of the employment of the Architect, the Owner shall appoint a capable and reputable Architect, whose status under the contract shall be that of the former Architect.

"Art. 40. Arbitration.—All questions subject to arbitration under this contract shall be submitted to arbitration at the choice of either party to the dispute.

"The demand for arbitration shall be filed in writing with the Architect, in the case of an appeal from his decision, within ten days of its receipt and in any other case within a reasonable time after cause thereof and in no case later than the time of final payment, except as otherwise expressly stipulated in the contract. * * *

"If there be one arbitrator his decision shall be binding; if three the decision of any two shall be binding. Such decision shall be a condition precedent to any right of legal action, and wherever permitted by law it may be filed in Court to carry it into effect.

"Art. 43. Cutting, patching and digging. —The Contractor shall do all cutting, fitting or patching of his work that may be required to make its several parts come together properly and fit it to receive or be received by work of other contractors shown upon, or reasonably implied by, the Drawings and Specifications for the completed structure, and he shall make good after then as the Architect may direct.

"Any cost caused by defective or ill-timed work shall be borne by the party responsible therefor."

And the general conditions, constituting a part of the contract documents, and the notice to contractors, provide:

"Every contractor bidding on this work shall carefully read these conditions in connection with the AIA printed general conditions and the typewritten specifications with the twenty-one sheets of drawings accompanying them, and submit his bid subject to all the conditions therein contained. He shall examine the building site and familiarize himself with all the conditions in connection with the construction of the High School Building.

"The fact of a Contractor submitting a bid will be construed by the Board to mean that the person bidding, bids and agrees to carry out all the provisions set forth in the drawings and the specifications."

The portion of the specifications out of which this lawsuit arose are as follows:

"Plaintiffs further allege that on page 39 of the specifications as originally drafted for said High School Building, the plaster work to be performed was specified as follows:

"'Plaster all ceilings, walls throughout the building with three coats, using Acme Plaster for the first two coats. All plaster on lath work to be well fibered. For the first coat on metal lath use fibered plaster, and the second coat to be unfibered plaster on all walls and ceilings throughout the building. All to be thoroughly trowelled to make a perfect finish when completed;' and that said plaster plans and specifications were as above alleged changed and altered by the Addenda appearing on page 53A of said specifications which was and is as follows:

"'Addenda to plaster work—instead of lime putty and plaster of paris finish, use an Acme finish trowelled to a hard surface and free from all defects.'"

Appellants pleaded that appellee selected Fred Taylor "as superintendent of construction, to check, supervise, interpret and approve all plans and specifications for the erection of the high school building to be erected for said defendant, and to pass upon and superintend the plans and specifications, and the construction of the said building, and that said Fred Taylor accepted and undertook such employment and did in fact supervise, check, approve and interpret the plans and specifications and construction of said high school building, and did check, pass upon and approve the plaster specifications for said high school building and approve the same as amended and declare such specifications sufficient in every particular"; employed Harry D. Payne "as supervising and consulting architect for such high school building and thereafter on the same day, F. W. Steinman and D. E. Steinman, architects, were likewise selected and employed by such board of education to prepare the

plans and specifications for and to superintend the construction of said high school building, with the understanding and agreement that the said board of education was to furnish said F. W. Steinman and D. E. Steinman, in the performance of their duties, with the assistance of Harry Payne, consulting architect, and that Fred Taylor, superintendent of construction, was to supervise, pass upon and approve the work of all such architects"; that Fred Taylor and the architects, acting for appellee, prepared the plans and specifications for the high school building, including the specifications for the plaster work, and that appellee approved these plans and specifications, and submitted the plans and specifications to contractors as the basis of their bids for the erection of the building; that, before submitting their bid for the erection of the building, at their request, Fred Taylor and the architects construed for appellants the plaster specifications, and in thus construing the specifications represented to appellants that "such Addenda meant that the finishing coat of plaster for the walls and ceilings of said building was to consist of lime putty gaged with unfibered Acme Plaster, which said architect, then and there represented would produce a better and harder finish than the combination originally specified at page 39, said architect then and there represented that such plaster specifications as contained in said Addenda were sufficient and capable of producing the desired result; * * * that in such acceptance in said manner the said Board of Education, and the defendant herein, by its subsequent adoption and approval of such amended specifications and of the acts of said Board and the said Taylor, each and both thereby represented and warranted to these plaintiffs that said plans and specifications, and particularly said plaster specifications as so amended and thereafter interpreted, were sufficient, and that a builder strictly complying therewith would meet each and all requirements, and the defendant warranted to these plaintiffs that if such amended plaster specifications, as interpreted by such superintendent, were strictly followed that the same would be sufficient and the results would be acceptable to defendants." On the specifications as submitted and interpreted to them, appellants submitted their bid for the erection of the building, which was accepted by appellee and, on its acceptance the contract copied above was duly executed. It was further alleged that the building superintendent controlled appellants "in the manner and method of carrying out such plans and specifications, and in the interpretation thereof, including the amended plaster specifications hereinafter mentioned, and in the manner and method of mixing and thereafter applying the plaster on the walls and ceilings of said building and with the knowledge and consent of said Board of Education and of defendant, and pursuant to its said employment contract, plaintiffs were instructed that they were to consult with and be governed by the directions of said Fred Taylor, Superintendent of Construction and Special Agent and Representative of the defendant in each and all such matters; that the acts of the said Fred Taylor constituted the acts of defendant, and defendant thereby participated in, directed and controlled its said architects in the manner and method of the performance of their duties." It was further alleged "that during the construction of said building and after the application of the first and second plaster coats on the walls and ceiling thereof, plaintiffs again sought the interpretation and advice of said architects and said Superintendent of Construction as to the meaning of the Addenda to the plastering specifications above set forth and constituting a part of the contract documents and that said architects and said superintendent of Construction advised plaintiffs that said finishing coat should be mixed from lime putty and unfibered Acme plaster and the plaintiffs were by said architects and their superintendent and by said superintendent of Construction instructed to prepare, mix and apply such finishing coat in accordance with said interpretation and requirements of said specifications; that said F. W. Steinman again advised plaintiffs that said finishing coat should consist of lime putty gaged with unfibered Acme Plaster, that the same would make a better and harder surface of plaster than the combination originally specified and that the use of lime putty and unfibered Acme Plaster was in accordance with, and met all requirements of said amended specifications; that thereupon plaintiffs slaked lime according to the specifications and under the direct control, supervision and instruction of said architects and their superintendent as well as said Superintendent of Construction and under such supervision and control of plaintiffs also mixed said finishing plaster using slaked

lump lime and hydrated lime of standard quality in such finishing coat; that the gaging of the finishing plaster was done with standard material strictly according to the specifications and the interpretation so made thereof by said architects and their superintendent and said superintendent of Construction, said plaster being prepared under the supervision and control of the superintendent of the architects and the Superintendent of Construction, agent of the defendant, and when so mixed was applied to the walls and ceilings of said High School Building under the direct supervision, control and direction of said architects and under the direct control, direction, supervision, sanction and approval of the Superintendent of Construction, Fred Taylor, and when so applied the surface of said walls presented a smooth, even surface suitable to and accepted by the architects, their superintendent and said superintendent of Construction, each and all of whom passed upon the appearance of said walls and ceilings, approved the same and instructed plaintiffs to proceed with the painting thereof. That after such instructions to so paint and acceptance of said walls and ceilings in their then condition by said architects, their superintendent and said Superintendent of Construction, the plaintiffs proceeded with such painting and expended large sums of money in painting the walls and ceilings of said High School Building in strict accordance with the plans and specifications and under the supervision and control of said architects and said superintendent of Construction, and that had said architects, their superintendent and said superintendent of Construction not so accepted said finishing plaster work on said walls and ceilings as sufficient and satisfactory and in accordance with the plans and specifications and thereafter required plaintiff to paint said walls and ceilings, plaintiffs would not have applied said paint and expended the sums necessary therefor.

"That after the painting of said walls and ceilings there appeared upon their surface numerous small pops, pits and spots, that upon the appearance of such defects said architects and Superintendent of Construction, each and all, required these plaintiffs to go over said building and to cut out such pops and to patch and repair said walls and ceilings and to re-paint the same; that prior to requiring such extra work and additional expenditures of plaintiffs, neither the defendant, its architects nor its superintendent of construction ascertained the true cause of such spots, pops and pits, but required plaintiffs to continue to use as the finishing plaster coat the combination of lime putty and unfibered Acme Plaster; that at the various times plaintiffs cut out such pops, patched and repaired said plaster work and re-painted same as required by said architects and Superintendent of Construction and at the time final payment was made under such construction contract, the plaintiffs did not know the real cause of the popping of such plaster, nor did plaintiffs know that the combination of unfibered Acme plaster and lime putty required to be used as such finishing coat was wrong; that plaintiffs relied upon the supposed superior knowledge of and the representations by the architects and Superintendent of Construction that they know the plaster combination required would make a smooth, hard finish surface, free from defects; that said architects and superintendent of construction should have determined the cause of such defects upon their first appearance and then and there advised plaintiffs that such combination of materials was defective; and in their failure and refusal to do so such architects and such superintendent of construction, either in gross ignorance, gross error and mistake or carelessly, capriciously and in bad faith caused and produced the damages to plaintiffs hereinafter alleged; that plaintiffs were not then charged with notice of any defects in such plaster combination so required, and were by such architects and Superintendent of Construction induced to believe and did believe that the same was free from defects and sufficient for all purposes, and were thereby induced to expend the sums hereinafter alleged in repainting such plaster work and in repainting and refinishing said walls and ceilings.

"That said amended plaster specifications, so interpreted to require plaintiffs to use the combination of lime putty and unfibered Acme Plaster as a finishing coat for the purpose of obtaining a smooth, glossy, hard surface, free from defects were inherently wrong and defective, in that unfibered Acme Plaster is not intended by the manufacturers thereof for such use, that unfibered Acme Plaster is by the manufacturers thereof intended, used and specified as an ingredient in only the first or second coats of plaster and not for use in a finishing coat; * * * that in specifying such combination of materials and

in interpreting such amended plaster specifications to require the use thereof, said architects and said Superintendent of Construction, either in gross ignorance, carelessness or indifference committed such gross error as to imply bad faith, and exercised the authority vested in them by defendant capriciously; that such use of unfibered Acme Plaster in combination with lime putty for such finish coat on said High School Building was the sole cause of the spots, pops and pits that appeared on the walls and ceilings of said building and proximately resulted in, produced and caused the additional work to be performed and additional money to be expended by plaintiffs, as was required by said architects and said Superintendent of Construction upon the appearance of such defects on the walls and ceilings of said High School Building. * * *

"That in examining, checking and approving said plaster specifications contained in such Addenda on page 53–A and in interpreting the same to mean lime putty gaged with unfibered Acme Plaster, and in failing to discover the existence of the defects in said specifications and in failing to correct the same during the progress of the work, the Superintendent of Construction, agent of defendant, failed to use and employ that degree of skill and ability, knowledge and intelligence which should have been employed by a competent and skillful Superintendent of Construction under the facts and circumstances surrounding his employment and duties herein, and that the failure to use such skill and intelligence on the part of said Fred Taylor constituted negligence in the performance of his duties and was a proximate cause of the pops and pits in said finish coat of plaster a proximate cause of plaintiffs' damages herein sued for.

"That such defects in said amended plaster specifications were not readily discernible, and the plaintiffs did not discover the existence of such errors prior to final payment; that under Article 14 of said 'General Conditions' plaintiffs were not required to discover defects in said amended plaster specifications, nor were plaintiffs made responsible for the existence thereof. * * *

"Fred Taylor, Superintendent of Construction, required that such written requests be made in duplicate and that he be furnished with a copy thereof; that after complying with such request, plaintiffs were furnished with certificates which they presented to said Board of Education, representing the defendant, whereupon such Board refused to approve or recommend payment of any of said certificates of the architects F. W. Steinman and D. E. Steinman until the respective amounts in each such certificate had been approved by the said Fred Taylor, and upon such approval being had said Board recommended payment and plaintiffs were paid by defendant the various amounts of such certificates. * * *

"and plaintiffs say that they did not know of the existence of such defects and could not have known of the same in the exercise of reasonable diligence and ordinary care at the time of such final certificate. * * *

"that in so ordering that the plaintiffs repair, patch and repaint said plastering work, the said architects and said Taylor, agent of the defendant, knew that said work was not contemplated under the contract documents, and that said work was being done at an extra expense to the plaintiffs; the extra work and extra materials and extra expense thereby entailed resulted in damages to plaintiffs because of errors in said contract documents and particularly in the amended plaster specifications, and in the wrongful act of the Superintendent of Construction in the interpretation he made thereof requiring the use of unfibered Acme Plaster and lime putty as a finish plaster coat, and in the neglect of said Superintendent to ascertain and to advise plaintiffs of the true cause of said pops and plaster defects. * * *

"That such delay, the furnishing of such extra material, the performance of such extra work and such additional expense thereby incurred were each and all required of plaintiffs by reason of errors in the contract document and caused by the acts of the agents and employees of defendant and required of plaintiffs by the architects and such superintendent of construction in attempting to obtain a smooth, glossy hard surface on the finish plaster coat by using a combination of unfibered Acme Plaster and lime putty; such damages by delay, such extra material, extra work and additional expense and reasonable profit thereon and loss of use of the final payment, being of the reasonable value and worth of Twenty-five Thousand ($25,000.00) Dollars."

Appellee answered by general demurrer and other defenses not necessary to mention; and by way of cross-action pleaded against appellants that they entered into a written contract secured by a bond in the sum of $10,000, "guaranteeing that cross-defendants, McDaniel Brothers, would correct and/or replace any defects as to materials and workmanship in its work on said high school building, within the period of two years from and after said 11th day of April, 1930; and further protecting and guaranteeing during said two-year period each and every guarantee as required in the body of the specifications, referred to in said contract." Appellee alleged all essential elements of this contract of guaranty, its breach and the damages proximately resulting therefrom.

The lower court sustained appellee's general demurrer to appellants' petition, and appellants' general demurrer to appellee's cross-action. From that judgment, both parties have appealed to this court.

### Opinion.

Appellants make the following general propositions attacking the trial court's order sustaining the general demurrer:

First. The building superintendent and the architect were the agents of appellee. This contention is overruled. Under the contract and the plans and specifications, the superintendent of construction and the architects were not the "agents" of either party; they were the judges of the performance of the work and authorized by both parties to act in that capacity. That they were selected and paid by appellee was immaterial. Their relation to this contract was that of impartial judges between the parties, and not as "agents" of either party. This relation was clearly stated and defined in the contract, plans, and specifications, and mutually agreed to by both parties as an essential part of the contract for the erection of the high school building. See article 38, supra, of the "general conditions." McKenzie Const. Co. v. Chanowsky (Tex.Civ.App.) 86 S.W.(2d) 480. In 4 Tex.Jur. 707, discussing "agency in general" of architects, it is said:

"The terms of building contracts, together with the plans and specifications, usually determine the character and extent of the agency of an architect. Construed together, these fix the limits of his authority beyond which his acts are not binding on the owner."

Second. Appellants pleaded that the superintendent of construction and the architects acted fraudulently, ignorantly, unfairly, etc., in preparing the plans and specifications for submission to bidders and in their construction of the plaster specifications for them, thereby proximately causing them to suffer the damages sued for. It appears from the petition that the plans and specifications were prepared and adopted by appellee, submitted to appellants, and construed for them, before appellants submitted their bid and before the acceptance of their bid by appellee and before the execution of the contract. There was no allegation of collusion between appellee and the superintendent of construction and the architects after the execution of the contract, or of any change in the plans and specifications after the execution of the contract, or that appellants were required to do anything in the erection of the building that was not included in the contract and plans and specifications as explained to them before they submitted their bid. The superintendent of construction and the architects required nothing of appellants, on the allegations of their petition, except to execute the contract they had made. The allegations of fraud, ignorance, bad faith, etc., were mere conclusions of the pleader that had no basis in the contract and specifications which formed the foundation of appellants' cause of action. As the superintendent of construction and the architects were not the "agents" of appellee, and as there was no collusion between them and appellee to perpetrate a fraud upon appellants, these allegations did not constitute a cause of action. It was the duty of the superintendent of construction and the architects to require appellants to execute the contract in all respects, for they "took the work on this very condition." Kettler Brass Mfg. Co. v. O'Neil, 57 Tex.Civ.App. 568, 122 S.W. 900.

Not only were appellants presumed by law to know the nature of the contract and of the plans and specifications executed by them, but, by the very terms of the contract, they affirmatively represented that they had that knowledge; thus they agreed:

"Every contractor bidding on this work shall carefully read these conditions in

connection with the AIA printed general conditions and the typewritten specifications with the twenty-one sheets of drawings accompanying them, and submit his bid subject to all the conditions therein contained. He shall examine the building site and familiarize himself with all the conditions in connection with the construction of the High School Building.

"The fact of a Contractor submitting a bid will be construed by the Board to mean that the person bidding, bids and agrees to carry out all the provisions set forth in the drawings and the specifications."

So the contract excluded this "ignorance" upon which appellants based their cause of action.

█ Third. On the facts alleged appellants contend that appellee "warranted" the sufficiency of the plaster specifications, and that, if executed in the manner explained by the superintendent of construction and the architects, and under their instructions, the specifications would produce an "Acme finish trowelled to a hard surface and free from all defects." This proposition is not the law of Texas. The owner has the right to submit to prospective bidders any character of plans and specifications for the erection of his building. The bidder himself must know the nature of the plans and specifications, and must decide for himself whether or not, by the due execution of the plans and specifications, he can erect and deliver to the owner the character of building called for by the contract. It is a simple matter of contract; the bidder has agreed to erect the building—the very building—upon which he submitted his bid, by the use of certain specific materials and according to specific plans and specifications. The owner does not warrant that the materials and plans and specifications will produce the building; that fact the bidder must decide for himself and at his peril. There is no law compelling him to submit his bid, but, if he bids, he must execute his contract or respond in damages. The law of this proposition was so clearly stated by our Supreme Court in Lonergan v. San Antonio Trust Co., 101 Tex. 63, 104 S.W. 1061, 106 S.W. 876, 22 L.R.A.(N.S.) 364, 130 Am.St.Rep. 803, that no useful purpose could be served by quoting therefrom. The following additional authorities support that conclusion: Hill v. City of Beaumont (Tex.Civ.App.) 5 S.W.(2d) 590; American Surety Co. v. San Antonio Loan & Trust Co. (Tex.Civ.App.) 98 S.W. 387; Lonergan v. San Antonio Trust Co., 101 Tex. 63, 104 S.W. 1061, 106 S.W. 876, 22 L.R.A.(N.S.) 364, 130 Am.St.Rep. 803; Dearing & Sons v. Texas Construction Co. (Tex.Com.App.) 1 S.W.(2d) 265; Albus v. Ford (Tex.Civ.App.) 296 S.W. 981; McElwrath v. City of McGregor (Tex.Civ.App.) 58 S.W.(2d) 851; 4 Tex.Jur. par. 4, p. 709; par. 13, p. 724; 7 Tex.Jur. par. 24, p. 566; par. 58, p. 573. As a summary of the law on this proposition, we quote as follows from 7 Tex.Jur. 573:

"The contractor is obligated to do the work according to the plans and specifications which have been made a part of the contract. By agreeing to construct a building according to plans and specifications furnished, he is deemed to represent that he understands them and impliedly warrants that he can erect the building according to them, and he cannot excuse himself for non-performance on the ground that they are defective."

Our discussion of appellants' proposition of "warranty" is in due recognition of the doctrine of Totten v. Houghton (Tex.Civ. App.) 2 S.W.(2d) 530, wherein the contract required the installation by the contractor of six bookcases four feet wide between two windows separated by a space of eighteen inches.

█ For another reason, appellants' petition was fatally defective. They did not plead that it was impossible to execute the plaster specifications, but only that the material called for by the plans and specifications did "not always result in a smooth, glossy, hard surface, free from defects." On this point we make the following additional quotation from appellants' petition:

" * * * Unfibered Acme as used in the vicinity of Beaumont, Texas, and elsewhere is not a relatively pure gypsum product, but contains certain impurities, and that its use in such vicinity, and elsewhere, will not always result in a smooth, glossy hard surface free from defects as was desired in the finish plaster coat of said High School Building; that such unfibered Acme plaster is a cheaper product than is used for finish coats as used, intended and specified by the manufacturers thereof, and that a more expensive and purer gypsum product is used, intended and specified to be used in combinations of finish coats."

No proposition of law could deny appellee's right to require the use of the ma-

terial called for by the plaster specifications, if by its use the contractor could produce "a hard surface free from all defects." That result might be difficult to secure; to produce that result the contractor might be required to incur extra expense. But the extra hazard inherent in the plaster specifications was clearly a matter of contract. It was immaterial that appellants did not know the extent of their obligation and were ignorant of the nature of the material called for by the specifications, as explained to them, and that the use of the material would not always "result in a smooth, glossy, hard surface, free from defects." It was also immaterial that the superintendent of construction and the architects knew, or might have known by the exercise of ordinary care, that the material called for by the specifications was not recommended by the manufacturer for this specific purpose, and was not suitable for use in the Beaumont climate, and did not always produce a hard, smooth finish free from defects. Having contracted to do the plaster work by the use of an "Acme finish trowelled to a hard surface and free from all defects," and, since that result was possible under the plans and specifications, appellants were bound to execute their contract.

It follows that the judgment of the lower court sustaining the general demurrer against appellants' petition should be and it is hereby in all things affirmed.

■ The trial court erred in sustaining the general demurrer to appellee's cross-action; appellee pleaded a simple contract, its breach by appellants, and damages proximately resulting from the breach.

Affirmed in part and in part reversed and remanded.